# EXHIBIT A

Attorney(s):
Attorney Id No.:
Law Firm:
Address:

Matthew A. Luber, Esquire
017302010
McOmber McOmber & Luber, P.C.
39 E. Main Street
Marlton, New Jersey  08053

Telephone No.:          (856) 985-9800
Fax No.:                (856) 263-2450
E-mail:                 mal@njlegal.com
Attorney(s) for Plaintiff(s): Jesse C. Crosson, PH.D., Plaintiff

*11-17-2020*
*11-16-2020*

JESSE C. (JAY) CROSSON, PH.D., Plaintiff

Plaintiff(s)

vs.

TMF HEALTH QUALITY INSTITUTE, STEPHEN D. THOMAS,
DEBBIE LOVATO. THOMAS MANLEY, et al.t al.    Defendant(s)

SUPERIOR COURT OF NEW JERSEY

_____ LAW DIVISION

MIDDLESEX
COUNTY

DOCKET NO.:   MID-L-7812-20

CIVIL ACTION

𝔖𝔲𝔪𝔪𝔬𝔫𝔰

FROM THE STATE OF NEW JERSEY

To the Defendant(s) Named Above:

　　　The plaintiff, named above, has filed a lawsuit against you in the Superior Court of New Jersey.  The complaint attached to this summons states the basis for this lawsuit.  If you dispute this complaint, you or your attorney must file a written answer or motion and proof of service with the deputy clerk of the Superior Court in the county listed above within 35 days from the date you received this summons, not counting the date you received it.  (A directory of the addresses of each deputy clerk of the Superior Court is provided and available in the Civil Division Management Office in the county listed above and online at http://www.judiciary.state.nj.us/prose/10153_deptyclerklawref.pdf.)  If the complaint is one in foreclosure, then you must file your written answer or motion and proof of service with the Clerk of the Superior Court, Hughes Justice Complex, P.O. Box 971, Trenton, NJ 08625-0971.  A filing fee payable to the Treasurer, State of New Jersey and a completed Case Information Statement (available from the deputy clerk of the Superior Court) must accompany your answer or motion when it is filed.  You must also send a copy of your answer or motion to plaintiff's attorney whose name and address appear above, or to plaintiff, if no attorney is named above.  A telephone call will not protect your rights; you must file and serve a written answer or motion (with fee of $ 175.00_____ and completed Case Information Statement) if you want the court to hear your defense.

　　　If you do not file and serve a written answer or motion within 35 days, the court may enter a judgment against you for the relief plaintiff demands, plus interest and costs of suit.  If judgment is entered against you, the Sheriff may seize your money, wages or property to pay all or part of the judgment.

31 - Summons - Law or Chancery Divisions
Superior Court - Appendix XII-A - CN 10792
Rev. 11/14   P2/16



Printed by ALL-STATE LEGAL®
A Division of ALL-STATE International, Inc.
www.aslegal.com   800.222.0510      Page 1

If you cannot afford an attorney, you may call the Legal Services office in the county where you live or the Legal Services of New Jersey statewide hotline at 1-888-LSNJ-LAW (1-888-576-5529).   If you do not have an attorney and are not eligible for free legal assistance, you may obtain a referral to an attorney by calling one of the Lawyer Referral Services.   A directory with contact information for local Legal Services Offices and Lawyer Referral Services is provided and available in the Civil Division Management Office in the county listed above and online at http://www.judiciary.state.nj.us/prose/10153_deptyclerklawref.pdf.

Dated:   November 11, 2020

/s/ Michelle M. Smith

Michelle M. Smith, Esquire *Clerk of the Superior Court*

Name of Defendant to be Served:   **STEPHEN D. THOMAS**

Address of Defendant to be Served:   **c/o TMF Health Quality Institute
3107 Oak Creek Drive
Suite 200
Austin, Texas  78727**

31 - Summons - Law or Chancery Divisions
Superior Court - Appendix XII-A - CN 10792
Rev. 11/14   P2/15

Powered by
HOTdocs

Printed by ALL-STATE LEGAL®
A Division of ALL-STATE International, Inc.
www.aslegal.com   800.222.0510   Page 2

# Directory of Superior Court Deputy Clerk's Offices
## County Lawyer Referral and Legal Services Offices

**ATLANTIC COUNTY**
Deputy Clerk of the Superior Court
Civil Division, Direct Filing
1201 Bacharach Blvd., First Floor
Atlantic City, NJ 08401
LAWYER REFERRAL
(609) 345-3444
LEGAL SERVICES
(609) 348-4200

**BERGEN COUNTY**
Deputy Clerk of the Superior Court
Civil Division, Room 115
Justice Center, 10 Main Street
Hackensack, NJ 07601
LAWYER REFERRAL
(201) 488-0044
LEGAL SERVICES
(201) 487-2166

**BURLINGTON COUNTY**
Deputy Clerk of the Superior Court
Central Processing Office
Attn: Judicial Intake
First Floor, Courts Facility
49 Rancocas Road
Mt. Holly, NJ 08060
LAWYER REFERRAL
(609) 261-4862
LEGAL SERVICES
(609) 261-1088

**CAMDEN COUNTY**
Deputy Clerk of the Superior Court
Civil Processing Office
Hall of Justice, First Floor
101 South Fifth Street, Suite 150
Camden, NJ 08103
LAWYER REFERRAL
(856) 482-0618
LEGAL SERVICES
(856) 964-2010

**CAPE MAY COUNTY**
Deputy Clerk of the Superior Court
9 North Main Street
Cape May Court House, NJ 08210
LAWYER REFERRAL
(609) 463-0313
LEGAL SERVICES
(609) 465-3001

**CUMBERLAND COUNTY**
Deputy Clerk of the Superior Court
Civil Case Management Office
60 West Broad Street, P.O. Box 10
Bridgeton, NJ 08302
LAWYER REFERRAL
(856) 696-5550
LEGAL SERVICES
(856) 691-0494

**ESSEX COUNTY**
Deputy Clerk of the Superior Court
Civil Customer Service
Hall of Records, Room 201
465 Dr. Martin Luther King Jr. Blvd.
Newark, NJ 07102
LAWYER REFERRAL
(973) 622-6204
LEGAL SERVICES
(973) 624-4500

**GLOUCESTER COUNTY**
Deputy Clerk of the Superior Court
Civil Case Management Office
Attn: Intake, First Floor, Court House
1 North Broad Street
Woodbury, NJ 08096
LAWYER REFERRAL
(856) 848-4589
LEGAL SERVICES
(856) 848-5360

**HUDSON COUNTY**
Deputy Clerk of the Superior Court
Superior Court, Civil Records Department
Brennan Court House, First Floor
583 Newark Avenue
Jersey City, NJ 07306
LAWYER REFERRAL
(201) 798-2727
LEGAL SERVICES
(201) 792-6363

**HUNTERDON COUNTY**
Deputy Clerk of the Superior Court
Civil Division
65 Park Avenue
Flemington, NJ 08822
LAWYER REFERRAL
(908) 236-6109
LEGAL SERVICES
(908) 782-7979

**MERCER COUNTY**
Deputy Clerk of the Superior Court
Local Filing Office, Courthouse
175 South Broad Street, P.O. Box 8068
Trenton, NJ 08650
LAWYER REFERRAL
(609) 585-6200
LEGAL SERVICES
(609) 695-6249

**MIDDLESEX COUNTY**
Deputy Clerk of the Superior Court
Middlesex Vicinage
Second Floor - Tower
56 Paterson Street, P.O. Box 2633
New Brunswick, NJ 08903-2633
LAWYER REFERRAL
(732) 828-0053
LEGAL SERVICES
(732) 249-7600

**MONMOUTH COUNTY**
Deputy Clerk of the Superior Court
Court House
P.O. Box 1269
Freehold, NJ 07728-1269
LAWYER REFERRAL
(732) 431-5544
LEGAL SERVICES
(732) 866-0020

**MORRIS COUNTY**
Morris County Courthouse
Civil Division
Washington and Court Streets
P.O. Box 910
Morristown, NJ 07963-0910
LAWYER REFERRAL
(973) 267-5882
LEGAL SERVICES
(973) 285-6911

**OCEAN COUNTY**
Deputy Clerk of the Superior Court
118 Washington Street, Room 121
P.O. Box 2191
Toms River, NJ 08754-2191
LAWYER REFERRAL
(732) 240-3666
LEGAL SERVICES
(732) 341-2727

**PASSAIC COUNTY**
Deputy Clerk of the Superior Court
Civil Division
Court House
77 Hamilton Street
Paterson, NJ 07505
LAWYER REFERRAL
(973) 278-9223
LEGAL SERVICES
(973) 523-2900

**SALEM COUNTY**
Deputy Clerk of the Superior Court
Attn: Civil Case Management Office
92 Market Street
Salem, NJ 08079
LAWYER REFERRAL
(856) 935-5629
LEGAL SERVICES
(856) 691-0494

**SOMERSET COUNTY**
Deputy Clerk of the Superior Court
Civil Division
P.O. Box 3000
40 North Bridge Street
Somerville, NJ 08876
LAWYER REFERRAL
(908) 685-2823
LEGAL SERVICES
(908) 231-0840

**SUSSEX COUNTY**
Deputy Clerk of the Superior Court
Sussex County Judicial Center
43-47 High Street
Newton, NJ 07860
LAWYER REFERRAL
(973) 267-5882
LEGAL SERVICES
(973) 383-7400

**UNION COUNTY**
Deputy Clerk of the Superior Court
First Floor, Court House
2 Broad Street
Elizabeth, NJ 07207-6073
LAWYER REFERRAL
(908) 353-4715
LEGAL SERVICES
(908) 354-4340

**WARREN COUNTY**
Deputy Clerk of the Superior Court
Civil Division Office
Court House
413 Second Street
Belvidere, NJ 07823-1500
LAWYER REFERRAL
(908) 859-4900
LEGAL SERVICES
(908) 475-2010

*Updated: 8/21/13*



Printed by ALL-STATE LEGAL®
A Division of ALL-STATE International, Inc.
www.aslegal.com   800.222.0510   Page 3

Matthew A. Luber, Esq. - NJ ID # 017302010
  mal@njlegal.com
R. Armen McOmber, Esq. - NJ ID # 018251998
  ram@njlegal.com
Christian V. McOmber, Esq. – NJ ID # 012292010
  cvm@njlegal.com
Kelly E. Adler, Esq. - NJ ID # 019242008
  kea@njlegal.com
Charles J. Kocher, Esq. – NJ ID # 016952004
  cjk@njlegal.com
Meghan A. Clearie, Esq. - NJ ID #306642019
  mac@njlegal.com
Jeffrey D. Ragone, Esq. - NJ ID # 276772018
  jdr@njlegal.com
McOMBER McOMBER & LUBER, P.C.
39 East Main Street
Marlton, New Jersey 08053
(856) 985-9800 Phone
(856) 263-2450 Fax
*Attorneys for Plaintiff, Jesse C. (Jay) Crosson, Ph.D.*

| | |
|---|---|
| JESSE C. (JAY) CROSSON, PH.D., <br><br> Plaintiff, <br><br> vs. <br><br> TMF HEALTH QUALITY INSTITUTE, STEPHEN D. THOMAS, DEBBIE LOVATO, THOMAS MANLEY, ABC CORPORATIONS 1-5 (fictitious names describing presently unidentified business entities); and JOHN DOES 1-5 (fictitious names describing presently unidentified individuals), <br><br> Defendants. | SUPERIOR COURT OF NEW JERSEY LAW DIVISION MIDDLESEX COUNTY <br><br> DOCKET NO.: <br><br> <u>Civil Action</u> <br><br> **COMPLAINT & DEMAND FOR TRIAL BY JURY** |

Plaintiff Jesse C. (Jay) Crosson, Ph.D. ("Plaintiff"), by way of this Complaint against

Defendant TMF Health Quality Institute ("Defendant TMF" and/or "Corporate Defendant"),

Defendant Stephen D. Thomas ("Defendant Thomas"), Defendant Debbie Lovato ("Defendant

Lovato"), and Defendant Thomas Manley ("Defendant Manley") (collectively "Defendants"),

alleges as follows:

1

## INTRODUCTION

This case concerns the precise discrimination and retaliation the New Jersey Law Against Discrimination ("NJLAD") N.J.S.A. 10:5-12 *et seq.* is intended to eradicate.  Plaintiff is a high-level, dedicated corporate executive who was subjected to intentional, repeated, and unlawful retaliation for objecting to, and attempting to remediate, racial prejudice and discriminatory practices occurring in the workplace.  Despite having been praised for his hard work, his dedication, and his diligence in carrying out his duties, and despite having received not a single disciplinary action or reprimand at any point in time in his career with Defendant TMF, when Plaintiff reported the misconduct and diversity issues through proper channels, Plaintiff's career at Defendant TMF was finished.

As discussed below, in blatant retaliation for engaging in protected conduct, Defendants intentionally thwarted Plaintiff's efforts to create a corporate culture that fostered inclusion and diversity, deliberately smeared his character to individuals throughout the company, made false accusations regarding his job performance and conduct in the workplace, interfered with his ability to carry out his duties, and subjected Plaintiff to a sham internal investigation, all in a concerted and coordinated effort to cover-up his eventual wrongful termination of employment.  In fact, when Plaintiff reported as much to his superiors, Defendants ignored the opportunity to take corrective action and immediately terminated his employment – ***the next business day under the guise of "a reduction in force."***

In short, while Defendant TMF claims "the company strives to ensure a workplace with a diverse team of people and professions … free of discrimination, intimidation, and harassment," this rhetoric is entirely hollow.  Fortunately, New Jersey law provides redress for individuals subjected to such treatment in the workplace. Plaintiff thus brings this lawsuit.

## PARTIES

1.       At all relevant times herein, Plaintiff is a Jewish, Caucasian individual residing in Highland Park, New Jersey and was employed by Defendant TMF as a Quality Improvement Executive for Research and Assessment.

2.       Defendant TMF has a principal place of business at 3107 Oak Creek Drive, Suite 200, Austin, Texas 78727. At all times relevant hereto, Defendant is an "employer" as defined under the NJLAD and directly employed Plaintiff and Individual Defendants.

3.       Defendant Thomas is a Senior Advisor to the President and CEO of Defendant TMF.  Defendant Thomas also serves as the Chief Human Resources Officer for the company.  Defendant Thomas is, upon information and belief, a citizen of Texas.  This claim is brought against Defendant Thomas in his individual capacity and/or as an agent or servant of Defendant TMF during the course of his employment.

4.       Defendant Lovato is the head of Business Development of Defendant TMF.  Defendant Lovato is, upon information and belief, a citizen of Texas.  This claim is brought against Defendant Lovato in her individual capacity and/or as an agent or servant of Defendant TMF during the course of her employment.

5.       Defendant Manley is the Chief Executive Officer for Defendant TMF.  Defendant Manley is, upon information and belief, a citizen of Texas.  This claim is brought against Defendant Manley in his individual capacity and/or as an agent or servant of Defendant TMF during the course of his employment.

6.       Defendant ABC Corporations 1 through 5 are currently unidentified business entities who have acted in concert with Corporate Defendant(s), and/or currently unidentified business entities responsible for the creation and/or implementation of harassment or anti-

3

discrimination policies of Corporate Defendant(s), and/or currently unidentified business entities who have liability for the damages suffered by Plaintiff under any theory advanced herein.

7.      Defendants John Does 1 through 5 are currently unidentified individuals who acted in concert with Defendants and/or currently unidentified individuals responsible for the creation and/or implementation of harassment or anti-discrimination policies of Corporate Defendant(s) and are currently unidentified individuals who may have liability for the damages suffered by Plaintiff under any theory advanced herein.

## FACTS COMMON TO ALL CLAIMS

8.      Plaintiff repeats each and every allegation set forth above as if set forth fully herein at length.

9.      Since 1984, Defendant TMF has been a Quality Improvement Organization in the business of improving care provided to Medicare beneficiaries through cooperative efforts with the health care community.

10.     Defendant TMF "promotes quality health care through contracts with federal, state and local governments, as well as private organizations" by "develop[ing] and implement[ing] a broad array of health care quality improvement projects."[1]

11.     Defendant TMF's mission statement is "to make measurable improvements in the quality and delivery of health care."[2]

12.     Defendant TMF's core values as stated on its website include "model integrity, embrace innovation, celebrate success, strive for excellence, foster trust and teamwork, and focus on those we serve."[3]

---

[1] https://www.tmf.org/Government-Services/Products-and-Services
[2] https://www.tmf.org/Company-Information/Company-Overview/Governance-Mission
[3] https://www.tmf.org/Company-Information/Company-Overview/Governance-Mission

13. According to the Defendant TMF's Employee Handbook, the Equal Employment Opportunity policy's purpose is ***"To ensure that the company provides equal opportunity for employment to all individuals and makes reasonable efforts to reflect an employee population that mirrors the state's diverse workforce."***

14. Regarding the work environment, "the company strives to ensure a workplace with a diverse team of people and professions. This work environment is achieved through a productive, efficient workforce that is free of discrimination, intimidation, and harassment."

15. But, as discussed herein, the aforementioned "Equal Employment Opportunity policy" exists in name only.

16. Despite these core values, Defendant TMF fostered a hostile and retaliatory work environment wrought with discriminatory and racist conduct committed by upper-management employees.

17. Defendants also discriminated against Plaintiff due to his religion and retaliated against him immediately after he attempted to remediate the company's lack of equal opportunity measures and its refusal to make any real strides towards improving company diversity.

18. At its core, the company suppressed minority employees, failed to provide minority employees with job advancement opportunities, failed to cultivate a culture of inclusion, and disproportionately promoted the careers of Caucasian employees.

19. Plaintiff accepted the offer to work at Defendant TMF on September 13, 2018. Plaintiff's direct supervisor was Russell Kohl, Defendant TMF's Chief Medical Officer, Innovations Team.

20. Plaintiff was hired as the Quality Improvement Executive for Research and Assessment with Defendant TMF.

21.     While discussing the position in August 2018, Dr. Kohl praised Plaintiff's work performance and potential contributions to the company:

- "The folks on the call were all very comfortable with your vision, style and capabilities and would like to delve into the logistical specifics in a way that might enable us all to make decisions by the end of this week."
- "We are creating a new position for you."
- "While I do anticipate that it will ultimately involve directing projects and managing the associated staff, I'd like to keep you engaged with the analytics and  innovation teams for a portion of your time."
- "… we'd like to use the Senior Innovation Strategist/Researcher position to get you in the door without having to wait for the development of a fully new position (generally takes a month or two)."
- "I'd like to get your views across our work before tying you to a specific team."

22.     As part of his job duties, Plaintiff was responsible for the Data Analytics Group where he mentored senior professionals, led staff recruitment, and strategically mamanged resources across multiple projects for Defendant TMF.

23.     During the course of his employment, Plaintiff increased billable hours within the Data Analytics group by 30%.

24.     Plaintiff also designed and implemented a company-wide writing program for Defendant TMF, focused on reducing proposal development costs and improving technical proposal quality.

25.     Plaintiff provided subject matter expertise and quality assurance reviews across a multitude proposals potentially worth tens of millions of dollars and on multiple funded projects.

26.     With Plaintiff's consultations and revisions of proposals, Defendant TMF successfully increased its Quality Improvement Organization service area adding an additional state.

27.     Further, as part of his role with Defendant TMF, Plaintiff led the adoption and implementation of new accounting and business development software while simultaneously negotiating a 58% cost reduction for said software and other services..

28.     Overall, Plaintiff has proved to be an exceptional employee, evidenced also by the following performance evaluations, for Defendant TMF by increasing revenue, decreasing costs, and improving the quality of employee's work.  Specifically:

> From: Russell Kohl
> To: Jay Crosson
> Subject: FW: Jay Crosson - 2019 Executive KPIs
> Date: Thursday, January 16, 2020 10:54:58 AM
> Attachments: Adobe Digital Signature Instructions for PAF.pdf Jay Crosson 2019 KPIs.pdf
>
> Attached is your 2019 KPI sheet. *You blew it out of the water.* Please sign via adobe and return it to me…
>
> *Russell Kohl, MD, FAAFP*
> TMF Health Quality Institute
>
> ….
>
> From: Fred Staeck
> To: DG_Innovation Team
> Subject: Jay getting Kudos during CEO Roundtable with remote employees today
> Date: Wednesday, May 29, 2019 4:20:48 PM
>
> Jay was complimented several times by Tom Manley during our CEO Roundtable with several remote folks.  The compliments were around 12th SOW contributions and helping TMF respond to a changing landscape.
>
> *Congrats Jay!*

7

Hope this isn't embarrassing Jay, but good news should also travel fast.

Fred

Fred Staeck RN, BSN, PMP
Innovation Project Manager
TMF Health Quality Institute
3107 Oak Creek Drive, Suite 200 Austin, TX 78727-3107
Phone: (678) 943-1226
Email: Fred.Staeck@tmf.org
Web sites: www.tmf.org or http://tmfqin.org
**…**

From: Russell Kohl
To: Jay Crosson
Subject: Annual Review
Date: Thursday, October 24, 2019 5:22:37 PM
Attachments: Crosson 2019 Perf Eval.pdf

***You're doing awesome and pushing us to be better!***

Russell Kohl, MD, FAAFP
Chief Medical Officer
TMF Health Quality Institute
3107 Oak Creek Drive, Suite 200 Austin, TX 78727-3107
Phone: (405) 706-3821
Email: Russell.Kohl@tmf.org
Web sites: www.tmf.org or http://tmfqin.org

## Performance Evaluation

| Employee's Name: Jesse "Jay" Crosson, PhD | | Employee's Job Title: Quality Improvement Exec, Research and Assess | |
|---|---|---|---|
| Evaluator's Name: Russell Kohl, MD | | Evaluator's Job Title: Chief Medical Officer | |
| | **Key Performance Indicators (KPI)** | **Standard/Expectation** | **Achieved (Year-End)** |
| 1) | Oversees, coordinates and manages health research projects | Identify and participate in the development of topical pilot projects | ☒ Yes   ☐ No |
| 2) | Collaborates with the Business Development Department | Lead the preparation and submission of contract and grant proposals | ☒ Yes   ☐ No |
| 3) | Oversees and provides consultation to company teams | Conduct interviews and analysis to properly define challenges/potential solutions | ☒ Yes   ☐ No |
| 4) | Represent TMF research capabilities externally | Build new relationships with potential funders, govt agencies, and collaborating research | ☒ Yes   ☐ No |
| 5) | | | ☒ Yes   ☐ No |

**Initial Meeting**                                                         **Date:** 11/28/18

| Initial meeting held to discuss expectations and establish above KPI's |
|---|

**Mid-Year Meeting**                                            **Date:** Ongoing 2019

| Weekly meetings on project performance were held, along with intermittent touchbases on individual career planning |
|---|

**Year-End Meeting**                                            **Date: 10/24/19**

| *Dr Crosson has brought invaluable competencies and energy to TMF. His active participation in the external implementation and research environments have provided the company with enhanced business development and collaboration opportunities, while his internal leadership and management skills strongly contributed to winning the NQIIC contract vehicle for TMF. He approaches situations thoughtfully and with a genuine desire to enhance both individual and corporate capabilities in a manner that both resolves the immediate issues and sets a firm foundation for future success.* |
|---|

29.     Plaintiff also received a bonus of over $16,000 as recent as February 21, 2020 for his "invaluable competencies and energy… active participation… leadership and management skills… [and] he approached situations thoughtfully and with a genuine desire to enhance both individual and corporate capabilities…"

**Plaintiff Was an Excellent Employee and Ambassador
for Company Diversity Initiatives – That All Changed When Plaintiff Reported Racist
Conduct and Exposed the Company's Failed Equal Opportunity Policies**

30.     After noticing a number of red flags, and as a part of his executive position with the company, Plaintiff repeatedly attempted to broaden the company's antiquated policies and initiatives in connection with diversity matters.

31.     On April 28, 2020, Plaintiff held a conference call with Teri Shea, an HR Specialist who is responsible for maintaining Defendant TMF's Affirmative Action Plan ("AAP").

32.     The purpose of this call was to discuss the educational qualifications on professional level job descriptions that Plaintiff was working on as part of his duties to reorganize the analytics group of Defendant TMF. Ms. Shea had been repeatedly resisting the addition of educational qualifications; however, her reasoning was nonsensical and unsupported.

33.     Plaintiff expected the call to illuminate this back and forth between Ms. Shea and himself, but he did not expect to be met with racist views and troubling backlash.

34.     Ms. Shea, despite maintaining the AAP at Defendant TMF, proceeded to tell him no educational requirement could be included for these highly technical jobs because ***"black people do not get masters and doctoral degrees at the same rates."***

35.     Plaintiff immediately objected to Ms. Shea – explaining that her comment and views were unequivocally racist.

36.     Plaintiff was forced to hang up the phone due to Ms. Shea's abrasive reaction after Plaintiff told Ms. Shea that her statement was racially prejudiced.  Plaintiff told Ms. Shea, ***"this conversation is disturbing on so many levels that I can no longer continue having it with you."***

37.     Plaintiff reported the racist behavior and comments to his direct supervisor, Russell Kohl, who instructed him to report it to Ty Clift, the Director of Contracts and Compliance.

38.     Plaintiff reported the interaction via phone and email on April 28, 2020 that same day.  Plaintiff also reported a more general concern that the company had a general problem with diversity culture and inclusion of minority employees. Specifically:

> From: Jay Crosson
> To: Ty Clift
> Subject: HR interaction
> Date: Tuesday, April 28, 2020 5:41:00 PM
>
> Hi Ty,
>
> Here is a summary of the interaction I had with Teri Shea in HR today:
>
> - Teri has been working with me on revising the Analytics Group job descriptions in line with the reorganization that you and I have previously discussed. Throughout this process, she has repeatedly resisted my efforts to ensure that the job descriptions align with my assessment of the needs of TMF for a successful and productive analytics group. Key to this reorganization is increasing the professional expectations that TMF has for senior analytics group staff. As part of this, I have determined that we need more consistent and professionally-aligned educational and

training requirements for potential recruits. Specifically, I have determined that entry-level analysts should have a bachelor's degree (or experiential equivalent), that senior analysts should have a master's degree (or experiential equivalent), and that senior data scientists should have a doctoral degree (or experiential equivalent). The current senior staff in the analytics group all agree with this assessment. As I have tried to implement these changes, Ms. Shea has consistently refused to implement these changes.

- Earlier today, I sent her two emails (forwarded separately to you). One thanking her for her work on the entry level positions and making some final minor modifications to those descriptions. The second email indicated to her that her changes to the senior level positions were still not acceptable as they did not include the appropriate educational qualifications for the position.

- At approximately 2:15 pm central time today, I called Ms. Shea to discuss the educational qualifications issue. We have previously discussed this issue multiple times and I have made my requirements clear to her each of these times. Today, when I pressed her to include the master's level qualification, she told me I needed to describe to her what someone would learn in that training that was required for the job. I gave her a high-level answer focused on training in study design and methods as it would not be appropriate to explain to her all of the training that typically is entailed in master's level training in statistics or epidemiology. She then indicated that this would be a problem from an equal employment opportunity perspective. I asked her to explain how that could possibly be the case. ***She then proceeded to tell me that "black people" don't get master's and doctorates at "the same rates" and so therefore this would constitute some sort of discrimination. I pointed out to her that this statement was in itself a "racist statement". She then said that she is "not being racist" by saying this. I reminded her that I was not saying that she was being racist but rather that the statement she made was a racist one. She then got more confrontational about this and I cut her off saying "this conversation is disturbing on so many levels that I can no longer continue having it with you." I then hung up.***

There are several serious issues raised by Ms. Shea's actions:

- Her consistent refusal to meet the needs of the analytics group in a collaborative way has created additional work for

strategic direction and management of the analytics group in alignment with the direction agreed upon by senior leadership. The barriers that she has put forth throughout this process have interfered with efficient management and constitute a barrier to recruiting appropriately trained staff to support our work.

- The racist effect of her interpretation of EEO rules and HR procedures. By lowering the educational expectations for these positions, TMF presents a less inviting workplace to minority candidates who have the appropriate training for the positions. Moreover, hiring individuals without the right educational preparation sets those individuals up for less successful careers.

- The "fact" that "black people" don't get advanced degrees in a large enough number to be able to hire them is preposterous. The first African American to earn a PhD in the US was W. E. B. Du Bois. He earned his degree from Harvard in 1896. While African Americans face reduced educational opportunities in America, there are literally tens of thousands of African Americans with masters or doctoral level training.

- Lowering the educational requirements of these highly technical jobs at TMF will have the likely effect of discouraging African Americans with this level of training from applying as they will assume that they are over-qualified for the position.

*The lack of diversity at TMF has troubled me for some time. I see now that the issues go beyond the applicant pool.*

Thank you for discussing this with me today.

Jay

**Jay Crosson, Ph.D.**
**Quality Improvement Executive, Research and Assessment**
**TMF Health Quality Institute**
Phone: 732-801-3872
Email: jay.crosson@tmf.org
www.tmf.org or http://tmfqin.org
*Improving Lives by Improving the Quality of Health Care*

39.     Despite the disturbing and racist nature of these comments by Ms. Shea, Plaintiff

did not receive a response from Ty Clift for nearly two (2) weeks.  Plaintiff thus followed up asking

about next steps.  Specifically:

> From: Jay Crosson <Jay.Crosson@tmf.org>
> Sent: Friday, May 8, 2020 8:38 AM
> To: Ty Clift <Ty.Clift@tmf.org>
> Subject: Following up on HR
>
> Hi Ty,
>
> Have you completed your examination of the HR issues I raised? If
> so, what are the next steps? I would like to proceed with the
> revisions of the job descriptions for the analytics group as soon as
> possible.
>
> Regards,
>
> Jay
>
> **Jay Crosson, Ph.D.**
> **Quality Improvement Executive, Research and Assessment**
> **TMF Health Quality Institute**
> Phone: 732-801-3872
> Email: jay.crosson@tmf.org
> www.tmf.org or http://tmfqin.org
> *Improving Lives by Improving the Quality of Health Care*

40.     Aware of the gravity of the comments made by Ms. Shea, Russell Kohl emailed

Plaintiff about a follow up from Ty Clift.  Dr. Kohl himself highlighted the ***"importance of***

***diversity"***:

> From: Russell Kohl <Russell.Kohl@tmf.org>
> Sent: Monday, May 11, 2020 12:34 PM
> To: Jay Crosson <Jay.Crosson@tmf.org>
> Subject: HR Interaction Follow-Up
>
> I wanted to follow-up to ensure that you had a resolution from Ty
> regarding the incident. I spoke with him last week and understood
> that he was going to get back with you, but the connection was
> pretty bad.

*Relately, I had a discussion with Tom about the importance of diversity of thought and the impacts that institutional racism could play in that, particularly when it comes to differential academic standards.* He was very interested in the idea of focusing some recruiting efforts directly towards underrepresented groups who have the desired academic credentials- such as direct relationships with historically underrepresented academic centers (HBCU's, Native American Institutions, Hispanic Universities, etc). *I suggested that we take our learnings from the analytics team interns and see if we might be able to develop an ongoing internship-like model to actively engage diverse candidates early in their training/careers- which he was very interested in.* Additionally, the University of Puerto Rico could be another location that we might look into for their data analytics capacity and a possible partnership or recruitment venue…

Thoughts?

Russell Kohl, MD, FAAFP
Chief Medical Officer
TMF Health Quality Institute
3107 Oak Creek Drive, Suite 200 Austin, TX 78727-3107
Phone: (405) 706-3821
Email: Russell.Kohl@tmf.org
Web sites: www.tmf.org or http://tmfqin.org
*Improving Lives by Improving the Quality of Health Care*

41.     Plaintiff responded to Dr. Kohl, stating he had not heard back from Ty Clift, but he

appreciated Dr. Kohl's efforts.

From: Jay Crosson
To: Russell Kohl
Subject: RE: HR Interaction Follow-Up
Date: Monday, May 11, 2020 12:40:00 PM

*I have not had a resolution on that from Ty as of yet.* I sent him an email but he did not reply to that one. I'll follow up with him by phone to see what he thinks, as I would still like to move forward with the job description and title changes as soon as possible. I am holding off on promotion for Nicole until after that gets resolved, but I am thinking I should probably move forward on that regardless. What do you think?

*Thanks for bringing the diversity issue up with Tom. I am heartened by his response and like your ideas about how to move*

*forward on this issue. Once you are back, I would be happy to*
*work on it with you and start thinking about how to make this*
*happen.*

Warm regards,

Jay

**Jay Crosson, Ph.D.**
**Quality Improvement Executive, Research and Assessment**
**TMF Health Quality Institute**
Phone: 732-801-3872
Email: jay.crosson@tmf.org
www.tmf.org or http://tmfqin.org
*Improving Lives by Improving the Quality of Health Care*

42. About two (2) weeks after the incident with Ms. Shea, Ty Clift responded to

Plaintiff. His reply consisted of nothing more than several half-hearted ideas and was a clear

attempt to downplay the comments.

43. Ty Clift, and in turn the company, made the decision to double-down on Ms. Shea's

comments and endorse her approach to hiring initiatives:

> From: Ty Clift <Ty.Clift@tmf.org>
> Date: Monday, May 11, 2020, 3:50 PM
> To: Jay Crosson <Jay.Crosson@tmf.org>
> Subject: RE: Following up on HR
>
> Hi Jay,
>
> I meant to get back to you earlier. I have spoken with multiple
> people including Stephen and Teri independently, and researched
> documentation and websites. Here is what I found, breaking it into
> two categories: 1) comments made in yours and Teri's phone call;
> and 2) appropriate position descriptions.
>
> 1) Teri made her comments from the perspective of being the person
> at TMF who maintains our Affirmative Action Plan (AAP), and
> interfaces with the EEOC and OFCCP including periodic audits. She
> works with adjusting TMF's EEO goals, incorporating feedback
> from external sources on the adequacy of TMF's efforts. She also
> reviews external information on job applicant pools and statistical

factors to consider in making best efforts to meet our goals, and AAP compliance.

Having learned this detail through multiple discussions and material review, I recommended to HR is that it is appropriate to preface a comment on a sensitive topic with a qualification about statistical trends or a similar reference. My understanding is that is what Teri intended by stating that restricting position descriptions to people with higher education degrees could introduce EEO risks. However, there was already disagreement and frustration in your phone call, and (with hindsight) it would have been more appropriate to reset the discussion with a neutral reference to how TMF manages its AAP, and guidance on compliance risks like the following: https://www.eeoc.gov/foia/eeoc-informal-discussion-letter-217. Let me know if you would like to discuss this further.

2) There should be a strategic discussion, perhaps including Tom, about the potential benefits and risks of rewriting existing position descriptions and future job postings with requirements for higher education degrees. Other than requiring bachelor degrees, TMF limits higher-level requirements to positions requiring licensure, like CPA, MD, or RN. A Masters or PhD when desired is stated as preferred. This is consistent with job postings I reviewed for data scientists, researchers, analysts on peer websites like Booz Allen Hamilton and Accenture.

Organizations that perform and brand themselves as research and development leaders have different approaches. That 'branding' is something TMF should discuss, as it could help avoid or defend against an EEO complaint. I reviewed the career websites for Mathematica, The RAND Corporation, and The Brookings Institution.

- Mathematica has job listings with PhD or Masters as requirements, but overall describes the environment that successful candidates will be joining in working with fellow PhDs in conducting sophisticated research. In doing so Mathematica risks that, for example, someone with a Masters in Epidemiology and highly qualified experience may claim discrimination by the PhD requirement (could be internal or external complaint). But that is their calculated risk, which is mitigated to an extent by the details of the job description and corporate environment.
- The Brookings Institution has a careers landing page that essentially says they perform PhD level research and they look for PhDs. This is further extrapolated in their different

job descriptions. In my opinion, their corporate experience and branding offers significant risk mitigation. ·

- The RAND Corporation has an interesting careers page https://www.rand.org/jobs.html. It opens with extensive messaging on diversity including a video, a written message from the CEO, and statistical bar charts on the demographics of the company including its board members. I don't know if this a result of proactive compliance, previous scrutiny, how they analyze everything they do, or a combination of these factors. The job postings I reviewed included one that required a PhD for work on a Defense contract, and a Data Scientist that stated a Masters was preferred.

My summary recommendation is that unless TMF is going to simultaneously create a branding campaign, adding hard requirements for advanced degrees to its job descriptions would create EEO risks. Those risks can be mitigated by stating that the higher degree is "preferred", and/or by allowing substitution of a bachelors plus specific years of experience or certifications.

Ty Clift
Director of Contracts and Compliance
TMF Health Quality Institute
512.334.1740
Ty.clift@tmf.org

44.     Plaintiff replied to Ty Clift stating: "I appreciate your attention to this sensitive issue. I will follow up with Russell when he returns next month to determine appropriate next steps."

45.     Plaintiff then sent another email to Ty Clift with examples of job descriptions with educational requirements similar to what Plaintiff sought to post that are being used.

46.     Ty Clift stated, *"research and development leaders have different approaches"* and therefore Defendant TMF would need to *"create a branding campaign"* to avoid the alleged EEO risks, but Plaintiff was able to find four (4) examples in the same sphere as Defendant TMF in approximately one (1) hour.

47.     It became clear that Ty Clift was covering up the diversity issues Plaintiff was

attempting to fix at Defendant TMF with bogus and inapplicable research:

> From: Jay Crosson <Jay.Crosson@tmf.org>
> Sent: Monday, May 11, 2020 4:46 PM
> To: Ty Clift <Ty.Clift@tmf.org>
> Subject: RE: Following up on HR
>
> Hi Ty,
>
> I did some looking around again at our competitors and peers (excluding the research and development firms) and found a number of positions at a comparable level of expertise with Master's degree or advanced degree required. Here are some:
>
> - The "Manager of Biostatistics" and "Senior Quality Improvement Facilitator" positions at Telligen: https://www.telligen.com/current-openings/
> - The "Senior Business Intelligence Developer" position at HSAG: https://hsag.jobs.net/enUS/job/sr-business-intelligence-developer/J3N85C6LTMR46Q6Y5J1
> - The "Communications Director" position at HQI: https://www.hqi.solutions/careers/communications-director/
> - The "Health Data Analyst" and "Project Manager" positions at The Carolinas Center for Medical Excellence: https://www.thecarolinascenter.org/default.aspx?pn=Careers
>
> These companies are all direct competitors and peers of TMF in the quality improvement space.
>
> Regards,
>
> Jay
>
> **Jay Crosson, Ph.D.**
> **Quality Improvement Executive, Research and Assessment**
> **TMF Health Quality Institute**
> Phone: 732-801-3872
> Email: jay.crosson@tmf.org
> www.tmf.org or http://tmfqin.org
> ***Improving Lives by Improving the Quality of Health Care***

48.    Backpedaling from his original insufficient points, Ty Clift responded to Plaintiff calling his job postings a ***"riskier path."*** Specifically:

From: Ty Clift <Ty.Clift@tmf.org>
Date: Monday, May 11, 2020, 6:19 PM
To: Jay Crosson <Jay.Crosson@tmf.org>
Subject: RE: Following up on HR

Hi Jay,

There is definitely a mix out there. I can tell you from speaking
with Stephen, Walter, and Tom, TMF is risk averse on this. It is
not illegal to post job descriptions like the ones you referenced, but
something like requiring a Masters Degree for HQI's
Communications Director would be easy to challenge. That
position should require a bachelors, and it is fine to state a masters
is preferred.

***I don't think TMF is willing to go down the riskier path.***

Ty Clift
Director of Contracts and Compliance
TMF Health Quality Institute
512.334.1740
Ty.clift@tmf.org

49.    Plaintiff was baffled by the company's stance.  Plaintiff clarified, again, that his

goal was to create a ***more, not a less***, diverse and welcoming environment:

From: Jay Crosson
To: Ty Clift
Subject: RE: Following up on HR
Date: Monday, May 11, 2020 7:54:54 PM

Thanks

I do not agree that I am advocating a riskier path than the current o
ne. ***My focus I on trying to create an environment that is more
diverse, welcoming, and inclusive.***

Regards

Jay
Sent with BlackBerry Work (www.blackberry.com)

50.    After the countless back and forth and focused attention from upper-management

on the racist comments made by Ms. Shea, the complaint and conduct were found to be

*unsubstantiated* even though they were reported on the same day by one of the two total people in the conversation.

51.     It is clear from the comment by Human Resource's Ms. Shea ("***black people do not get masters and doctoral degrees at the same rates***"), the workplace culture, hiring practices, and values of Defendant TMF are those that invite and perpetuate discrimination toward minorities.

52.     Even worse, following Plaintiff's complaints, Defendants engaged in a concerted effort to derail Plaintiff's diversity efforts and retaliate, ultimately resulting in his wrongful termination.

<u>Civil Unrest and Increased Awareness of Systemic</u>
<u>Racism in the Wake of George Floyd's Murder</u>

53.     On May 25, 2020, George Floyd was handcuffed and pinned to the ground face down by a police officer's knee on his neck until he died on the street. Two other police officers prevented many bystanders witnessing the slow and painful death from intervening.

54.     George Floyd's death triggered worldwide protests against police brutality, racism, and lack of accountability.

55.     Plaintiff reached out to Russell Kohl to suggest that the company make a statement in response to express solidarity with the Black community and to show support for the company's minority employees.

56.     On June 1, 2020, Plaintiff also volunteered his time to help with diversity and inclusion work in any way.  Specifically:

> From: Jay Crosson
> To: Russell Kohl
> Subject: diversity initiative
> Date: Monday, June 1, 2020 4:05:00 PM
>
> Let me know what I can do to help with the diversity and inclusion work.

Jay

**Jay Crosson, Ph.D.**
**Quality Improvement Executive, Research and Assessment**
**TMF Health Quality Institute**
Phone: 732-801-3872
Email: jay.crosson@tmf.org
www.tmf.org or http://tmfqin.org
*Improving Lives by Improving the Quality of Health Care*

57.     The next day, protests began in Austin, Texas, near where Defendant TMF is

headquartered. Plaintiff emailed Dr. Kohl again about ***"making a statement by email to TMF***

***employees committing TMF to fighting racism."***

58.     Plaintiff suggested the company engage in more focused recruiting, a public

statement regarding the incident, and a statement of support to all TMF employees in line with the

company's core values of ***integrity*** and ***teamwork***. Specifically:

> From: Jay Crosson
> To: Russell Kohl
> Subject: Minneapolis ... and Austin
> Date: Tuesday, June 2, 2020 11:57:00 AM
>
> Hi Russell,
>
> I am not sure if you have seen this news from Austin:
> https://www.kxan.com/austin-george-floydmike-ramos-
> protests/man-in-critical-condition-after-being-hit-by-less-lethal-
> round-during-austindemonstrations/
>
> I know that the Austin police have opened an investigation into this
> incident and it is likely that there are many others throughout the
> years that have not been publicized. ***I think it would be helpful for***
> ***Tom to make a statement by email to TMF employees committing***
> ***TMF to fighting racism, ensuring that all members of the staff***
> ***have a home at TMF, and offering support services to staff who***
> ***may need them during this upsetting period.***
>
> Regards,
>
> Jay

Jay Crosson, Ph.D.
Quality Improvement Executive, Research and Assessment
TMF Health Quality Institute
Phone: 732-801-3872
Email: jay.crosson@tmf.org
www.tmf.org or http://tmfqin.org
*Improving Lives by Improving the Quality of Health Care*

59.     Rather than laud Plaintiff for taking such initiatives, Plaintiff received nothing but

pushback and consternation regarding the various diversity efforts.

60.     On June 15, 2020 as a follow up from emails from Dr. Kohl and Defendant Manley

about an internship program, Dr. Kohl emailed a draft of the proposed internship program to

Plaintiff for his thoughts.  Plaintiff replied as follows:

> From: Jay Crosson
> To: Russell Kohl
> Subject: RE: First Draft Internship Program
> Date: Tuesday, June 16, 2020 3:09:00 PM
>
> Hi Russell,
>
> Thanks for the opportunity to review and comment on the internship
> proposal. I think this is a good start. My initial thoughts on this are
> as follows:
>
> - An internship program is a great idea and targeting the
>   marketing of it to HBCUs and other settings where we are
>   likely to increase our chances of getting qualified minority
>   applicants is a good way to help diversify our workforce over
>   time.
> - The compensation for the internship is lower than some
>   competitors but not unreasonably so.
> - In terms of eligibility, it is probably not necessary to specify
>   anything beyond the second bullet ("formally enrolled") and
>   then to state that applications will be "competitively
>   reviewed" since the "legal authority to work" is specified in
>   the Application Process section.
> - For the application process, I think we should ask for an
>   official transcript rather than just GPA verification.
> - Rather than creating a program across all of the areas you
>   list, I suggest starting with a small number of areas and

22

clearly describing what an applicant would need to show in order to be selected along with as detailed a description of the learning objectives as possible.

- I like the lecture/discussion series and the formal assignment of a mentor.
- I think specifically adding a statement that interns will "shadow" mentors on existing projects would be good.
- In addition to a written report, I think it would be good for students to present their findings and to open those presentations to anyone in the company.

I have a couple of more general comments on diversity, equity, and inclusion:

- The justification of diversity as a "competitive differentiator" is likely not accurate since many of our competitors have similar emphases and several have more robust diversity, equity, and inclusion efforts already under way.
- Alternatively, some of the reasons that I think we should work to improve diversity, equity, and inclusion at TMF are: 1) treating people equitably should be an essential part of any ethical corporate culture and increasing diversity and including diverse life experiences and backgrounds is the right thing to do; 2) increasing the diversity of our staff will increase the efficiency of our work by broadening the range of skills and experiences that we include in the planning and execution of work for our clients; 3) actively working on these issues moves us beyond mere legal compliance to positively expressing our values; 4) some potential clients require active efforts to address diversity, equity, and inclusion (for example, many health foundations have this as a specific evaluation criteria when scoring applications for contracts and grants); and 5) much of our work includes patient and family engagement efforts where a diverse workforce can be part of enhancing our corporate cultural competence and thereby increasing our effectiveness.

***Beyond the internship program, I think TMF needs to add diversity, equity, and inclusion to our list of core corporate values and then develop an internal initiative to operationalize and publicize those values and how they fit with and inform our other core values.***

***Finally, the silence of company leadership on racism at this time is likely to present a barrier when seeking more diverse candidates for either the internship or employment more generally moving***

> *forward. The longer we wait to speak out, the more it will look like*
> *we are speaking from a position of guilt rather than one of*
> *commitment on these issues. Our work is intended to improve the*
> *lives and health of Medicare beneficiaries specifically and of all*
> *Americans more generally. Given that background I find it*
> *incongruous that we are unable to say that Black Lives Matter.*

Regards,

Jay

**Jay Crosson, Ph.D.**
**Quality Improvement Executive, Research and Assessment**
**TMF Health Quality Institute**
Phone: 732-801-3872
Email: jay.crosson@tmf.org
www.tmf.org or http://tmfqin.org
*Improving Lives by Improving the Quality of Health Care*

61.    Dr. Kohl responded that the statement was reviewed by corporate counsel.  Dr. Kohl claimed that the counsel determined that if Defendant TMF put out a statement like the one Plaintiff emailed, the company would **never** get another "CMS contract" again.

62.    That response (which is obviously false) raised alarms bells that Defendant TMF purported diversity values were a farce.  Worse, Plaintiff feared that his efforts were beginning to create tension and that he could be subjected to retaliation for exposing (and trying to remediate) the company's diversity issues.

63.    On July 2, 2020, Plaintiff shared a "confronting structural racism in research and policy analysis" article with the head of communications, Emilie Fennell, who then forwarded the article to Defendant Manley and Defendant Thomas.  Plaintiff never received any response.

64.    Ironically, Ms. Fennell is now the designated lead for an internal diversity group with Defendant TMF that is also a pretextual committee and is in name only.

65.    Due to the above, and a result of how the company handled Ms. Shea's racist comments and subsequent investigation, Plaintiff took it upon himself to correct matters that were

or could be perceived as discriminatory.

66.    For example, on July 7, 2020, Plaintiff reached out to Piyusha Joshi, an analytic

staff member, who had been called by her last name instead of her first by Wendy Bradley,

LPC,CCAC - Director Comprehensive Primary Care, Plus.  Plaintiff addressed the matter head-

on:

> From: Jay Crosson <Jay.Crosson@tmf.org>
> Sent: Tuesday, July 7, 2020 7:45 AM
> To: Piyusha Joshi <Piyusha.Joshi@tmf.org>
> Subject: Misuse of your name
>
> Hi Piyusha,
>
> I noticed in Wendy's last email to you that she referred to you by
> your last name rather than your first name. I pointed this error out to
> her and if it happens again on an email that I am not copied on,
> please let me know and I will follow up accordingly. Please don't
> hesitate to let me know if there are other instances in which you are
> experiencing these types or other sorts of microagressions. If you
> would like to talk more please let me know.
>
> Sincerely,
>
> Jay
>
> Sent with BlackBerry Work
> (www.blackberry.com)

67.    Ms. Joshi responded to Plaintiff thanking him for his help.

> From: Piyusha Joshi <Piyusha.Joshi@tmf.org>
> Sent: Tuesday, July 7, 2020 9:05 AM
> To: Jay Crosson <Jay.Crosson@tmf.org>
> Subject: RE: Misuse of your name
>
> I appreciate you noticing that error!...although it does not matter
> much, I did want to let her know that Joshi is my last name, just so
> that she knows.
> Thank you for the help!

68.    On a call about the project, Defendant Lovato, lead of business development,

misgendered Ms. Joshi. Plaintiff respectfully reached out to Defendant Lovato, alerting her that

she had made a mistake, so she did not continue to do so.

> From: Jay Crosson
> Sent: Tuesday, July 7, 2020 10:05 AM
> To: Debbie Lovato <Debbie.Lovato@Tmf.Org>
> Subject: regarding Piyusha
>
> Hi Debbie,
> I hope this message finds you and your family well. I noticed on the
> call yesterday that you referred to Piyusha as "he", however, Piyusha
> identifies as a woman. I'm just letting you know so that you don't
> make this mistake in the future.
>
> Regards,
>
> Jay
>
> **Jay Crosson, Ph.D.**
> **Quality Improvement Executive, Research and Assessment**
> **TMF Health Quality Institute**
> Phone: 732-801-3872
> Email: jay.crosson@tmf.org
> Pronouns: he, him, his
> www.tmf.org or http://tmfqin.org
> *Improving Lives by Improving the Quality of Health Care*

69.     Concerned about the staffer and her blatant exposure to microaggressions by

various employees at Defendant TMF, Plaintiff emailed her stating he is available to her if there

are other instances of microaggressions and that he would follow up.

> From: Jay Crosson
> To: Piyusha Joshi
> Subject: misgendering on the call yesterday
> Date: Tuesday, July 7, 2020 10:07:00 AM
>
> Hi Piyusha,
>
> I noticed on the call yesterday that Debbie referred to you twice as
> "he" rather than "she" or by your name. I pointed this error out to
> her. If it happens again on a call that I am not on, please let me
> know and I will follow up accordingly. Please don't hesitate to let
> me know if there are other instances in which you are experiencing

these types or other sorts of microaggressions. If you would like to
talk more please let me know.

Sincerely,

Jay

**Jay Crosson, Ph.D.**
**Quality Improvement Executive, Research and Assessment**
**TMF Health Quality Institute**
Phone: 732-801-3872
Email: jay.crosson@tmf.org
Pronouns: he, him, his
www.tmf.org or http://tmfqin.org
*Improving Lives by Improving the Quality of Health Care*

70.     Plaintiff alerted Dr. Kohl of this obvious pattern and the need for leadership to

address the issues. Although Dr. Kohl agreed that the above was improper, Plaintiff never received

additional response from Dr. Kohl, from human resources, or the company.

71.     Later in July 2020, Plaintiff became concerned about the new hire screening process

for his analytics team as it appeared that no Black or Latino candidates had made it through the

screening.

72.     Before drawing any conclusions based on the pattern of discriminatory practices at

Defendant TMF, Plaintiff asked Human Resources to share the demographics of the original

applicant pool.

73.     The Human Resources staffer, who worked directly for Defendant Thomas, stated

that sharing the demographics would violate Equal Employment Opportunity rules because

Plaintiff may use the information to discriminate against the applicants that passed through the

screening process.  Plaintiff's goal always been to *increase* diversity at Defendant TMF and he

thus was dumbfounded by the company's stance on the matter. This is particularly concerning as

the senior leadership for Defendant TMF is virtually entirely Caucasian.

74.     Additionally, in July 2020 the company added a training in "unconscious bias." In Plaintiff's role as Quality Improvement Executive and as a person with an established interest in the topic, Plaintiff shared his comments and concerns about the racist messaging being relayed by the training itself:

> From: Jay Crosson
> To: Russell Kohl
> Subject: FW: Required Training - Understanding Unconscious Bias
> Date: Wednesday, July 8, 2020 1:44:00 PM
>
> Hi Russell,
>
> I completed this training today and think it is a good first step for this "ongoing effort" that Stephen references. Some issues I noticed with the material: 1) it is from the UK and does not reference in any way the historical or cultural environment in which we work. This has the unintended and unfortunate effect of minimizing the history and context of systemic racism in the US; 2) it essentially normalizes bias and discriminatory behaviors by attaching them to evolutionary adaptations and brain functioning – although it does try to help people learn to become conscious of these processes; 3) it is divorced from the TMF organizational context and presents bias as an individual rather than an organizational or systemic problem – this has the effect of minimizing TMF's responsibility to address these issues; and 4) the material was released in 2017 (and likely developed before the current administration took office in the US) and thus does not address issues that have arisen since then in the US context.
>
> Regards,
>
> Jay
>
> **Jay Crosson, Ph.D.**
> **Quality Improvement Executive, Research and Assessment**
> **TMF Health Quality Institute**
> Phone: 732-801-3872
> Email: jay.crosson@tmf.org
> Pronouns: he, him, his
> www.tmf.org or http://tmfqin.org
> *Improving Lives by Improving the Quality of Health Care*

75.     Despite being aware of the pattern of discrimination and racial prejudice, Defendant TMF perpetuated the racist and discriminatory nature of the workplace with a training designed to educate employees on unconscious bias.

76.     Plaintiff explained racism is not excusable and cannot be rationalized by a healthcare company as ***"evolutionary adaptations and brain functioning."*** In addition, Plaintiff explained the United States (especially as of late) and the United Kingdom are not comparable when discussing discrimination issues.

77.     Furthermore, Plaintiff, who identifies as Jewish, told Dr. Kohl that employees have made comments that were uncomfortably close to the two classic anti-semetic tropes of "pushy" and "cheap" behavior. Dr. Kohl simply replied that he had ***"never heard anyone say anything antisemitic at TMF,"*** but did not otherwise address the matter.

78.     In addition, at numerous points throughout Plaintiff's employment, Plaintiff was told he ***"does not speak Texan."*** When asked to clarify, Dr. Kohl stated Plaintiff has a ***"northeastern style of communication that rubbed the head of Business Development the wrong way since she has more of a Southern, even antebellum style of communication"*** (speaking about Defendant Lovato).

79.     Plaintiff was born in Florida and Defendant Lovato is also thought to have been born in Florida, meaning there is no reasonable distinction between the two. These consistent comments are similar to the classic anti-Semitic tropes.

80.     Defendant Manley, Defendant TMF's CEO, also sent an email about the upcoming holidays in September 2020, ironically as part of the information from the new diversity group.

81.     Despite the fact that Rosh Hashanah (one of the most important holidays on the Jewish calendar signifying a new year), and Yom Kippur (one of the holiest holidays on the Jewish

calendar signifying atonement) both fall in September, the only holiday highlighted by Defendant

Manley was "Grandparents Day":

> From: Erin Boeck <Erin.Boeck@tmf.org> **On Behalf Of**
> Tom Manley Sent: Thursday, September 10, 2020 9:39 AM
> Subject: CEO Update September 10, 2020
>
> **CEO UPDATE SEPTEMBER 10, 2020**
> […]
> *UPCOMING HOLIDAYS & OBSERVANCES*
> The Diversity Planning Workgroup is maintaining a calendar to
> highlight holidays and observances throughout each month. Please
> contact a workgroup member with any recommendations.
> **Grandparents Day, Sept. 13**
> On the Sunday following Labor Day, National
> Grandparents Day honors the love only grandparents can
> provide.

82.    Instead of working with Plaintiff to fulfill his job duties in his executive role and

aid his efforts to cure prejudice in a predominantly white company, Defendants resisted his ideas,

made racist comments, and proceeded to insult him and his own religion.

**In Retaliation for Plaintiff's Complaints of Discrimination, Defendants Drum Up
Bogus Disciplinary Issues Against Plaintiff, Subject to Him to a
Sham Investigation Designed to Cover Up the Discrimination/Retaliation**

83.    As highlighted above, Plaintiff was an exemplary employee with Defendant TMF.

84.    Plaintiff worked well with his colleagues and was an asset to the company.  His

experience and ideas increased revenues and decreased expenditures during his employment.

85.    Plaintiff received frequent positive feedback, such as, *"you blew it out of the*

*water," "you're doing awesome and pushing us to be better,"* and even direct and personal

compliments from Defendant TMF's CEO, Defendant Manley.

86.    In addition, Plaintiff's yearly performance review was so positive that it resulted in

a sixteen thousand-dollar ($16,000) bonus in February 2020.

87.     Although Plaintiff received multiple positive performance reviews, congratulatory emails about his efforts, and a substantial performance bonuses, Defendants manufactured a slew of baseless complaints in a sham investigation against Plaintiff in retaliation to his diversity efforts and attempts to stamp out discrimination in the workplace.

88.     Seemingly out of nowhere, on September 8, 2020, Plaintiff was told via email that complaint had been filed against him by an employee of Defendant TMF:

> From: Stephen Thomas
> To: Jay Crosson Subject: Private and Confidential – Notice of Complaint
> Date: Tuesday, September 8, 2020 5:33:58 PM
> Importance: High
>
> Dear Mr. Crosson,
>
> A complaint has been brought against you for unprofessional conduct and behavior that negatively affects the work environment of other employees.
>
> In particular, several personnel in the Business Development Office allege that you have demonstrated a pattern of obstructive, disrespectful, and rude behavior when interacting with their staff to include withholding resources and assistance. Additionally, the allegations noted that this behavior was present when interacting with other employees and teams throughout the Company.
>
> We have just received this complaint and, I must emphasize that we have not formed any conclusions or made any prejudgments about these allegations. We did, however, wish to bring it to your attention so that you can assist us in our investigation and have a fair opportunity to present your views and any explanations. We will be providing you additional information as the investigation proceeds.
>
> The Company is committed to ensuring that all company-initiated investigations are conducted in a fair, impartial, thorough, thoughtful manner and in compliance with all applicable federal, state, and local laws.
>
> The Company prohibits retaliation including making threatening communication by verbal, written or electronic means against any individual who reports or provides any information concerning

unlawful discrimination, harassment or other violations of company policies, rules and standards of conduct. Any employee found to be engaging in retaliation will be subject to disciplinary action up to and including termination.

Employees must also comply with reasonable requests from the Company investigator(s) regarding the investigation. Employee non-compliance and/or intentional or bad faith interference with an investigation may be subject to disciplinary action.

I will be reaching out to you for your responses after I have interviewed staff.

If you have any questions in relation to the above information, please do not hesitate to contact me.

**Stephen D. Thomas, SPHR, CCEP, CFE**
**Senior Advisor to the President and CEO**
**Chief Human Resources Officer**

89.     Plaintiff was shocked by this development, but immediately knew the complaint was pure retaliation and an effort to orchestrate his termination.

90.     Indeed, before this pretextual complaint, Plaintiff had not received any poor performance reviews or negative feedback regarding his behavior. To the contrary, Plaintiff's performance was exemplary.

91.     Notably, Plaintiff was never interviewed or asked to provide information in connection with the investigation.

92.     Rather, one month later, a "draft" report was issued to Plaintiff on October 7, 2020, whereby he was given only five (5) days to respond to the allegations:

From: Stephen Thomas
To: Jay Crosson
Cc: Russell Kohl
Subject: Complaint
Date: Wednesday, October 7, 2020 11:56:48 AM
Attachments: Investigation Summary -- Jay Crosson (October 2020) Draft.pdf

Mr. Crosson,

Attached is the complaint summary. Please provide any comments you wish to be included in the file. Yesterday, I was advised that another program area employee had made a complaint against you to their supervisor. I will be reviewing this complaint and may add to this report or initiate a new investigation as appropriate.

Please provide any comments you wish to provide no later than Monday, October 12, 2020.

**Stephen D. Thomas, SPHR, CCEP, CFE**
**Senior Advisor to the President and CEO**
**Chief Human Resources Officer**

### Complaint Investigation – Jay Crosson
### October 2020

A complaint was filed with Human Resources alleging that Jay Crosson has shown a pattern of disrespect to employees in the Business Development Office (BD) and demonstrated behaviors that were detrimental to a collaborative work environment.

**Complaint Issues and Investigation**

The following items were identified by Business Development staff and other personnel as representative behaviors demonstrated by Jay Crosson on numerous occasions and with various work groups. These behaviors were also corroborated by staff outside of business development that were present at these meetings.

1) When presented on 8/20 with the resume design with BD's proposed revisions (incorporating features BD adapted from competitors' resumes), Jay said that certain additions were "terrible" and looked like "amateur hour."  Jay indicated he wasn't going to spend more time on the resume project if BD didn't take his recommendation to use his preferred template.  ("If you don't want to listen to that, I have other things to do.") During this meeting an attempt was made to diffuse Jay's ire and it was advised that maybe the template should be shared with senior leadership to get their opinion. Jay advised that "I am senior leadership" and inferred his opinion was what counted.

2) During a website design meeting he was dismissive of the work of employees and publically referred to the current website as "terrible".

3) During a business development meeting, Crosson was asked to provide continued Analytics support for new proposals and he responded by

saying, "I estimate that we will have no staff available for business development work until June 2021" without offering any alternatives or solutions.

4) In August, Crosson served as a reviewer on the NAEMT proposal with Business Development Staff providing comments. During that conversation he was very critical of the NAEMT proposal and said every proposal TMF produces is garbage.

5) It was noted that he has been very disrespectful of bid decisions and strategy made by the Business Development Officer (in consultation with other TMF leadership) and questions these decisions in front of other staff in a manner that is not conducive to collaboration.

6) Finally, a comment was made that during the January 2020 Strategic Planning meeting that Crosson was rude and condescending toward other attendees. It was stated that he had to prove he was the smartest person in the room.

A staff member made the following comment. "His professional attitude and negativity towards TMF's work has given me pause." Additionally, comments outside of Business Development include that he is condescending, prone to temper tantrums when he doesn't get his way, and belittles people.

## Discussion

Mr. Crosson's behavior could be summed up as a form of bullying.  A subtler type of office bullying is sometimes known as smart bullying. An individual engaging in this type of intimidation often considers himself or herself to be an expert on just about any subject, and is not shy about sharing that knowledge with everyone else. Often, the tone used to deliver this knowledge is calculated to imply that the recipient lacks the knowledge or skill necessary to assimilate the data and be efficient around the office, thus undermining the confidence of others.

In addition, his interactions with other employees could be perceived as creation of an offensive work environment or more commonly referred to as a hostile work environment, a civil law term that refers to the behavior of an individual in a workplace that creates an environment that makes work difficult or uncomfortable for another person. For this behavior to reach a legal liability, the conduct must create a work environment that would be intimidating, hostile, or offensive to a reasonable person.

## Summary

In accordance to TMF policy, Jay Crosson has exhibited behavior that negatively affects the productivity or work environment of other

employees and behavior that is unprofessional or shows a lack of
respect for others and warrants disciplinary action.

**Stephen D. Thomas, SPHR, CCEP, CFE**
**Senior Advisor to the President and CEO**
**Chief Human Resources Officer**

93.     The complaint, report, and investigation were completely bogus for numerous

reasons.

94.     To begin, the August 20, 2020 meeting regarding criticism of a template redesign

is falsely attributed to Plaintiff.  In reality, the template was developed through a collaborative

process involving the head of communications (Emilie Fennell), a communications staff person

(Jodi Bowen), a staff member from business development (Erin Van Landignham), and another

member of the innovations group (Kris Calderon).

95.     After the meeting, Plaintiff and Greg Walker, Defendant TMF's proposal director,

spoke about letting business development update it instead, to which Mr. Walker agreed and

emailed Plaintiff thanking him for his work and that **_"today's call was helpful."_**  Specifically:

> From: Greg Walker <Greg.Walker@tmf.org>
> Sent: Thursday, August 20, 2020 3:58 PM
> To:  Jay  Crosson  <Jay.Crosson@tmf.org>;  Kris  Calderon
> <Kris.Calderon@tmf.org>
> Subject: Resume redesign project
>
> Jay and Kris,
>
> Thank you both for your work and thoughts on a new resume design
> for TMF.  I hear you clearly that you are not satisfied with the BD
> team's suggested revisions to the design.  As discussed, I will take
> your concerns back to the team for further consideration.  I do think
> the team has been focused on addressing client/customer needs with
> the new design, but I will make sure this is explicitly the guiding
> principle when making design decisions.
>
> If you have any further questions or concerns, please let me know.
>
> Thanks again,

Greg

…

From: Jay Crosson <Jay.Crosson@tmf.org>
Sent: Thursday, August 20, 2020 3:02 PM
To: Greg Walker <Greg.Walker@tmf.org>; Kris Calderon
<Kris.Calderon@tmf.org>
Subject: RE: Resume redesign project

Thanks for your efforts on this Greg. I wish you the best of luck with
the process.

Regards,

Jay

Jay Crosson, Ph.D.

…

From: Greg Walker <Greg.Walker@tmf.org>
Sent: Thursday, August 20, 2020 4:34 PM
To: Jay Crosson <Jay.Crosson@tmf.org>
Subject: RE: Resume redesign project

Thanks, Jay . . . I'll take any luck you can offer!

Seriously, though, I think I need to spend some time drilling down
on why certain individuals have strong opinions on certain features.
Today's call was helpful in reiterating that the reasoning for any
design decision must be to best address the needs of our potential
clients or partners.

Kris tells me you'll be out of the office next week—I hope you enjoy
the time off!

Greg

96.   Plaintiff heard nothing else regarding this meeting on August 20, 2020 until the

complaint was given to him by Defendant Thomas, which was almost three weeks later.

97.   Plaintiff's communications with Mr. Walker after the meeting show Plaintiff was

not making the statements he was accused of, the conversations and recommendations were completely civil and constructive, and Plaintiff was not inferring his opinion was the only one that mattered, as he was giving the work to someone else.

98.     Plaintiff was also accused of being *"dismissive of employee work,"* which, too, is false. For example, Plaintiff has offered opinions about the design of the company website, however he has specifically thanked the lead communications staffer (Hope Stehling) who is redesigning the website for her hard work and attention to detail:

> From: Debbie Lovato <Debbie.Lovato@tmf.org>
> Date: Tuesday, Apr 07, 2020, 6:01 PM
> To: Jay Crosson <Jay.Crosson@tmf.org>
> Cc: Kris Calderon <Kris.Calderon@tmf.org>
> Subject: Conversation with Tom - TMF Website
>
> I conveyed your concerns regarding the TMF Website with Tom and he is very open to suggestions for improvement.  He asked that you and Kris schedule a meeting with Emile and Hope regarding your suggestions for improvement.  It sounded like you have had some conversations with Emile on rebranding but would be good to meet again to revisit and brainstorm suggestions for improvement.
>
>
> Debbie Lovato, RN
> Business Development Officer
> TMF Health Quality Institute
>
> Direct: 512-334-1618
> Cell: 512-966-0888

99.     Plaintiff had an excellent, professional relationship with Emile Fennell, Director of Communications and External Relations. He offered his help to work on the website, as he was told Defendant Manley is *"very open to suggestions for improvement."*

100.    Ms. Fennell agreed to work on the website improvements with Plaintiff. Thanking an employee for his or her work is the opposite of dismissive.

101.    The complaint also alleges Plaintiff did not offer any alternatives or solutions to

having no staff available for business development work until June 2021. This allegation, too, is false.

102.    Plaintiff offered to handle all such requests himself until the near-term staffing availability problems could be solved.

103.    Plaintiff never refused any resources to business development and has been proactive about supporting any and all proposals.

104.    Plaintiff was also thanked by Mr. Walker for his help and attention to anticipated staffing challenges.

> From: Jay Crosson <Jay.Crosson@tmf.org>
> Sent: Tuesday, August 4, 2020 2:14 PM
> To: Russell Kohl <Russell.Kohl@tmf.org>; Debbie Lovato
> <Debra.Lovato@tmf.org>; Greg Walker
> <Greg.Walker@tmf.org>; Erin Van Landingham
> <Erin.VanLandingham@tmf.org>
> Subject: RE: Technical/SME Lead for TQMC
>
> I think the third option presented here is the best one. ***For the upcoming efforts, I will handle the business development needs myself.*** Please feel free to loop me in to whatever you decide to pursue.
>
> Regards,
>
> Jay
>
> **Jay Crosson, Ph.D.**
> **Quality Improvement Executive, Research and Assessment**
> **TMF Health Quality Institute**
> Phone: 732-801-3872
> Email: jay.crosson@tmf.org
> Pronouns: he, him, his
> www.tmf.org or http://tmfqin.org
> *Improving Lives by Improving the Quality of Health Care*
>
> …
>
> From: Jay Crosson <Jay.Crosson@tmf.org>
> Sent: Wednesday, August 5, 2020 11:49 AM

To: Greg Walker <Greg.Walker@tmf.org>; Debbie Lovato
<Debra.Lovato@tmf.org>; Erin Van
Landingham <Erin.VanLandingham@tmf.org>
Cc: Russell Kohl <Russell.Kohl@tmf.org>
Subject: RE: Technical/SME Lead for TQMC

I think the safest option at this point is to **designate me as the lead.**
If time gets freed up, we can bring in another member of the team
as well.

Regards,

Jay

Jay Crosson, Ph.D.
Quality Improvement Executive, Research and Assessment
TMF Health Quality Institute
Phone: 732-801-3872
Email: jay.crosson@tmf.org
Pronouns: he, him, his
www.tmf.org or http://tmfqin.org
**Improving Lives by Improving the Quality of Health Care**

…

From: Greg Walker <Greg.Walker@tmf.org>
Sent: Wednesday, August 5, 2020 12:54 PM
To: Jay Crosson <Jay.Crosson@tmf.org>; Debbie Lovato
<Debra.Lovato@tmf.org>; Erin Van Landingham
<Erin.VanLandingham@tmf.org>
Cc: Russell Kohl <Russell.Kohl@tmf.org>
Subject: RE: Technical/SME Lead for TQMC

Jay,

That sounds good—thanks!

**Again, I appreciate you bringing to our attention the anticipated
staffing challenges in the Analytics Group in the near future.**
Let's definitely keep in touch as this develops.  I definitely want to
be sure our contracts are getting the analytics support they need and
never want BD activities to hamper performance on any of these.

Thanks again,
Greg

105.    Not only did Plaintiff offer up his own time to help, he was also thanked for his attention to anticipated staffing challenges. The allegation that Plaintiff was being difficult to work with by offering no solutions to having to remedy the lack of available staff for business development work is untrue and completely baseless.

106.    Plaintiff was further accused of saying *"every proposal TMF produces is garbage."* Plaintiff never made this statement.   Rather, he professionally critiqued business development proposals (including the one referenced in the draft findings document) as he was asked to do.

107.    Plaintiff asked Erin Van Landingham, of the business development team, when the proposal was due as he was willing to rewrite it. She told Plaintiff it was essentially already sent, even though they had asked for Plaintiff's review. Plaintiff stated the existing process of writing proposals did not produce the highest quality proposals (something that CMS has confirmed in its recent ratings of TMF proposals) and that if different results were wanted, the process would need to change.

108.    Notably, Plaintiff is on the executive management team and is invested in the success of Defendant TMF, as evidenced by his concerns revolving around the diversity issues at the company and his attention to detail with proposal review.

109.    Plaintiff's job is to critique proposals, especially in the case of being specifically asked to do so, to make the proposals better which then makes Defendant TMF better.

110.    The complaint also falsely states Plaintiff is *"very disrespectful of bid decisions and strategy made by the Business Development Officer."* Plaintiff was a member of the senior leadership of the company, so critiquing decisions and strategy to make the company grow is part of his duty. As shown above, Plaintiff is a problem solver and cared deeply about the company

and its image.

111. Finally, Plaintiff allegedly made a *"rude and condescending comment"* at a meeting in January 2020, *ten months prior to this complaint*. Plaintiff was not made aware of any issues with his behavior since the receipt of the complaint and no basis to this allegation has been made by Defendant TMF. Notably, he was paid a performance bonus of more that $16,000 in February 2020 following this meeting.

112. Defendants go as far to state *"Mr. Crosson's behavior could be summed up as a form of bullying."*

113. The irony and pretext could not be more clear – although Plaintiff consistently pointed out racial prejudice and the diversity issues at Defendant TMF, Defendants swept Plaintiff's reporting of such conduct under the rug.

114. Instead of taking steps to improve the diversity issues and racial bias in the workplace, Defendant TMF created a sham investigation against Plaintiff to pretextually terminate his employment.

115. This investigation and the allegations made against Plaintiff are in retaliation for his engaging in protected conduct.

116. Pursuant to Defendant Thomas's request, Plaintiff responded in writing to each of the baseless allegations made against him.  Specifically:

**From:** Jay Crosson <Jay.Crosson@tmf.org>
**Date:** October 9, 2020 at 6:19:48 PM EDT
**To:** Stephen Thomas <Stephen.Thomas@tmf.org>
**Subject: RE: Complaint**

Mr. Thomas,

I am in receipt of the draft "Complaint Investigation." Needless to say, I believe that the complaints brought against me are not only unfounded, they are retaliatory. I have always tried to share my understanding of

industry best practices across a wide variety of company processes based on my prior experience and on my research. My supervisor has encouraged me to do so and has never told me that this constituted "bullying." I have tirelessly conducted my efforts to improve company efficiency and ensure more productive use of resources - as I am held accountable for company bottom line performance as part of my compensation. My work and track record speaks for itself, but I note that recent reviews from my direct supervisor throughout this period have been glowing: "you are crushing it," "you are doing awesome." While it saddens me to learn that these efforts are interpreted as showing a "lack of respect," the reality is, the complaints against me are nothing more than a concerted effort to force my resignation or cover up an otherwise unlawful termination. Whatever investigation the company purported to conduct was a complete sham and was designed to punish me. This investigation was never designed to give me a fair opportunity to defend myself against baseless accusations – I was not even interviewed or offered the opportunity to submit documents prior to receiving your "findings." As you know, I have repeatedly attempted to broaden the company's horizon on diversity matters. I have been met with resistance and retaliation and received push back on diversity efforts that are not only the right thing to do, but in line with the company's core values. For example:

1.      On April 28th, I had a call with an HR specialist in the company to discuss the need for educational qualifications on some technical and professional level job descriptions that I was working on as part of the reorganization of the analytics group. I was told on the call that we could not include an educational requirement (even though the job is highly technical) because "black people" don't get masters and doctoral degrees at "the same rates" and thus asking for these credentials would somehow constitute discrimination. I pointed out to her that this statement was in itself a "racist statement." She then said that she is "not being racist" by saying this. I reminded her that I was not saying that she was being racist but rather that the statement she made was a racist one. She then got more confrontational about this and I cut her off saying "this conversation is disturbing on so many levels that I can no longer continue having it with you." I then hung up. I discussed this interaction with my supervisor and he instructed me to report it to the company Compliance Officer. I did that via email and phone on the same day. Somehow my complaint was unsubstantiated.

2.      In early May 2020, I again brought up concerns about diversity in the company. Pointing out that some of the ways we describe our positions may be discouraging the most qualified minority applicants. My supervisor reportedly brought those concerns to the CEO and reported to me on May 11th that focused recruiting may be needed. Later the same day, the compliance officer emailed me to let me know that the HR staff member in the initial interaction described above should have "reset the discussion with a neutral reference to how TMF manages AAP." In

addition, he stated that without a new "branding campaign" it would not be possible to add degree requirements to technical positions without creating "EEO risks." Later on the same day, he characterized my suggestions as risky and said that after legal review "TMF is risk averse on this."

3.      Following the murder of George Floyd on May 25th, I reached out to my supervisor by phone to let him know that I thought it was appropriate for the company to make a statement that "black lives matter" and on June 1 volunteered to help in any way needed with diversity and inclusion work. On June 2nd I sent my supervisor an email about the police violence during protests in Austin suggesting that TMF "make a statement by email to TMF employees committing TMF to fighting racism, ensuring that all members of the staff have a home at TMF, and offering support services to staff who may need them during this upsetting period." No such statement was made.

4.      On June 16, I again reached out to my supervisor to provide some feedback on a proposed internship program that he thought could be a part of a diversity initiative at the company. In that email I stated: "I think TMF needs to add diversity, equity, and inclusion to our list of core corporate values and then develop an internal initiative to operationalize and publicize those values and how they fit with and inform our other core values. Finally, the silence of company leadership on racism at this time is likely to present a barrier when seeking more diverse candidates for either the internship or employment more generally moving forward. The longer we wait to speak out, the more it will look like we are speaking from a position of guilt rather than one of commitment on these issues. Our work is intended to improve the lives and health of Medicare beneficiaries specifically and of all Americans more generally. Given that background I find it incongruous that we are unable to say that Black Lives Matter." His response to me by phone was that this was reviewed by the company attorney and that the attorney had said something to the effect of "if you do that, you will never get another CMS contract." Of course, that is simply false. I once again became concerned that the company's purported diversity values were in name only.

5.      On July 2, I shared an article on confronting structural racism in research and policy analysis with the head of communications (who is now the designated lead for an internal diversity group) which she told me would be forwarded on to the CEO and head of HR. I did not hear back from either of them on this. This was another red flag.

6.      On July 7, I alerted a technical proposal lead that they had misused an analytics staff person's name. The staff person is South Asian. The person misusing her name replied and thanked me, as did the analytics staffer. On the same call, the head of business development misgendered the same staff person. I sent her an email on this and also an email to the staff person letting her know that I am available to her "if there are other instances in which you are experiencing these types or other sorts of microaggressions" so that I can follow up. I shared both of these instances with my supervisor but I never heard back from the head

of business development. There is an obvious pattern here, and a need for leadership to address these issues.

7.        In mid-July, during a hiring process for an entry level position in the group that I lead (analytics), I became concerned about the screening process that was used for initial applicants. The process used by HR had led to a final pool of candidates that did not appear to include any black or Latinx candidates despite my efforts to target the listing to graduates of historically black colleges and universities and other public universities noted for their diversity through sharing on LinkedIn. As I am concerned about the effectiveness of minority recruitment efforts, I asked a question of the HR lead and asked if they could share the demographics of the initial applicant pool. The staff person told me that this would violate "EEO" rules as I might use the information to discriminate. After some back and forth with HR, during which they informed me that reading cover letters unless they are specifically required in the job posting is "discriminatory," we had to repost the position and start over. The final candidate that I authorized hiring was an African-American woman just out of graduate training. If I did not advocate for this type of initiative, this candidate (and many other minorities) may have been overlooked.

8.        In July, the company added a training in "unconscious bias." I completed the training. On July 8, in my role as a quality improvement executive and as a person with already established interest in this topic, I shared my comments and concerns regarding the unconscious messages relayed by the training itself. Specifically, I noted that the program had been developed several years before the current incidents relating to racism, was set in a British context, and did not include US-specific examples. I noted my concern that this could send a subtle message that the company is not really committed to addressing these issues but is only going through the motions.

9.        I have experienced discrimination myself. At numerous points in conversations with my supervisor prior to your email I was told that I "don't speak Texan." When I discussed the email complaint with him by phone on 9/17, I pointed out the fact that the two allegations in your initial email were uncomfortably close to two classic antisemitic tropes: "pushy" and "cheap" and that people at the company know that I identify as Jewish. I also pointed out to him that the most recent communication from the CEO had highlighted the holidays upcoming in September as part of the information from the new diversity group. Despite the fact that the Jewish high holidays were fast approaching, the only holiday that was highlighted and described for September was "Grandparents Day." He assured me that he had "never heard anyone say anything antisemitic at TMF" and that he would characterize me as having a "northeastern" style of communication that had rubbed the head of business development the wrong way since she has a more "Southern, even antebellum" style of communication. I pointed out that both the head of business development and I are native-born Floridians and that I did not consider that to be a reasonable distinction to draw.

10.    In addition, I find it troubling that this investigation comes at the 2-year mark of my employment when I will soon be vested in company contributions to my retirement account. As a 56-year old employee, a loss of these benefits would be especially significant.

To be clear, before this investigation even began, I sounded the alarm about the lack of diversity and about discriminatory bias in the workplace. I was doing my job and following our so-called policies. While I have already explained to my direct supervisor that I thought the entire process around this complaint was retaliation for raising complaints and concerns about discrimination, it is now apparent to me that the investigation process itself was retaliation for bringing up racism as an issue at the highest levels of the company on multiple occasions.

While I am hesitant to do so (responding seems to dignify the matter), here is my point-by-point response to the specific claims in the draft findings document:

Point 1) the description of the meeting on 8/20 regarding the proposed revisions to the resume template falsely attributed the template design that was under discussion to me ("his preferred template"). In fact, the template under discussion had been developed through a collaborative process involving the head of communications (Emilie Fennell), a communications staff person (Jodi Bowen), a staff member from BD (Erin Van Landingham), and another member of the innovations group (Kris Calderon) and represented the consensus of the group. Greg Walker (from BD) then met with this group to let us know the feedback from BD on what the group had created. His feedback rejected all of the ideas of the group and reverted the look and feel of the document to the original design that we had been tasked with updating. I told him at the time that there was no point in continuing the process at this point since it appeared that the decision makers were the head of BD (and him). He suggested continuing the process, but I told him that it would be better for BD to take things from here. Later that day, Greg sent me an email thanking me for my "work and thoughts" on the design and agreed to take the concerns back to the BD team. I thanked him for his efforts and wished him the best of luck with the process going forward. He then responded that "today's call was helpful" and that he would "take any luck you can offer!" I heard nothing further until the complaint.

Point 2) I was never dismissive of the work of any particular employee. I offered my unvarnished opinion about the state of the company website and its usefulness from a marketing perspective. The head of communications has on multiple occasions agreed with me on the need for substantially revising the website look and feel. Throughout this process, I have been especially mindful to thank the lead communications staffer redesigning the website (Hope Stehling), offering my sincere thanks for her hard work and attention to detail. The redesign process has been collaborative and collegial throughout.

Point 3) I gave an accurate assessment of analytics staff support availability for new proposals. The assessment was communicated to my supervisor on numerous occasions with detailed data presentations. While I was out on PTO, my supervisor gave similar information using a different data source during a collaborative call between BD and the innovation group. Following my assessment, and discussion with my supervisor, I offered a solution for meeting these needs. Specifically, I offered to handle all such requests myself until the near term staffing availability problems could be solved. I have never refused any resources to BD and have been proactive about supporting any and all proposals.

Point 4) I was asked to provide a last-minute review of the NAEMT proposal. It was my professional assessment that the proposal was poorly written and sloppily conceptualized. I asked the BD staff member (Erin Van Landingham) about the due date of the proposal and offered to rewrite it if there was time. She told me that it was already essentially out the door (why I was asked to review remains unclear) and that unfortunately there would not be an opportunity to revise this particular draft. She then asked me if I thought that the quality of this proposal was representative of other proposals I had reviewed for TMF. I told her that the existing process did not produce the highest quality proposals (something that CMS has confirmed in its recent review of TMF proposals) and that if we wanted a different result it would need to change. I do not think that TMF proposals are "garbage." Rather, I think that improvement of technical quality is a business opportunity and is required for future growth of the company.

Point 5) I regularly question bid decisions and strategy in order to provide the most effective support possible to BD efforts. As a member of the senior leadership of the company, I think that this is my duty. Recently, I questioned such a strategy decision on a proposal development call and was told, "we're not going to discuss that." Following the meeting, I worked with the designated senior analyst for the proposal (Bethany Gabbard) to identify a staffing solution to support the proposal in question. This solution was offered less than one hour after the initial meeting with BD.

Point 6) I was not rude and condescending in the January 2020 Strategic Planning meeting and received no feedback regarding my behavior between the meeting in January and the receipt of this document nearly 10 months later. In the interim period, I have alerted my supervisor to several issues at TMF relating to diversity, equity, and inclusion. Since I have no idea what this aspect of the complaint references, I am unable to respond to the substance of it. Notably, at the Strategic Planning meeting I was tasked with implementing the one action item agreed on for immediate action - leading the purchase and implementation of new accounting and business development data systems (Deltek Costpoint and Deltek GovWin). I have successfully completed this task on time and under budget, realizing a significant savings off the initial price presented by Deltek.

46

There simply is no merit to any of the allegations made against me. Although the company has been aware of the retaliation against me, no one has done anything about it. I am tired of being treated in this manner and I expect the company to do something about it now.

Thank you,

Jay Crosson, Ph.D.

**Jay Crosson, Ph.D.**
**Quality Improvement Executive, Research and Assessment**
**TMF Health Quality Institute**
Phone: 732-801-3872
Email: jay.crosson@tmf.org
Pronouns: he, him, his
https://link.edgepilot.com/s/6a53b16b/H_4FKL_r1US7jQimXWEP8Q?u=
http://www.tmf.org/                                      or
https://link.edgepilot.com/s/9c880c86/r89BPZZOkkKbZiCDadOKLQ?u=ht
tp://tmfqin.org/
*Improving Lives by Improving the Quality of Health Care*

117.    Plaintiff received no response to this email whatsoever.

118.    Plaintiff was never interviewed, he was never asked to provide documents, he received no response to his complaints of prior discrimination/retaliation, he was never provided a warning or otherwise subjected to any progressive discipline (which would have been retaliatory too).

119.    Rather, Defendants immediately and summarily terminated Plaintiff's employment the following business day, October 13, 2020.

120.    Defendant Thomas emailed Plaintiff the following and attached a separation agreement:

**From:** Stephen Thomas <Stephen.Thomas@tmf.org>
**Date:** October 13, 2020 at 4:01:34 PM EDT
**To:** jesse.crosson@gmail.com
**Subject: Separation Agreement**

Mr. Crosson,

Effective October 13, 2020 your employment with TMF has ended. Attached is a Separation Agreement for your review, execution and

return to my attention. We will be sending you a copy by an overnight mail service. Information Security staff will be reaching out to you regarding return of equipment.

Feel free to reach out if you have any questions.

**Stephen D. Thomas, SPHR, CCEP, CFE**
**Senior Advisor to the President and CEO**
**Chief Human Resources Officer**

**TMF Health Quality Institute** | Oak Creek Plaza, Suite 200 | 3107 Oak Creek Dr.
| Austin, TX 78727
512-334-1726 Direct | 512-329-6610 Main | 512-334-1779 Fax |
**stephen.thomas@tmf.org**

121.   According to the separation agreement presented to Plaintiff, Defendants falsely assert Plaintiff's employment is ***"being terminated due to a reduction in force." See Ex. A hereto.***

122.   The separation agreement and stated reasons for termination constitute a thinly veiled attempt to cover-up a pretextual and unlawful retaliatory termination.

123.   The inconsistencies in these documents further prove Plaintiff was fired in retaliation for pointing out racial inequities in the workplace and for reporting specific instances of racial misconduct.

124.   Defendants did not have an effective anti-harassment policy in place, Defendants have not maintained an anti-harassment policy that is current and effective, and Defendants' anti-harassment policy existed in name only.

125.   Defendants did not maintain useful formal and informal complaint structures for victims of discrimination, harassment, and retaliation.

126.   Defendants did not properly train their supervisors and/or employees on the subject of discrimination, harassment, and retaliation.

127.   Defendants failed to institute appropriate monitoring mechanisms to check the effectiveness of the policies and complaint structures.

128.    Defendants did not have a commitment from the highest levels of management that discrimination and harassment will not be tolerated.

## COUNT ONE – NJLAD RETALIATION/IMPROPER REPRISAL

129.    Plaintiff repeats each and every allegation set forth above as if set forth fully herein at length.

130.    Plaintiff complained and/or protested against the continuing course of harassing, discriminatory, and retaliatory conduct set forth at length above. Defendants had knowledge about these complaints and/or protests.

131.    As a direct result, Defendants took retaliatory action against Plaintiff.

132.    Defendants are vicariously, strictly and/or directly liable to Plaintiff for unlawful retaliatory conduct in violation of the NJLAD pursuant to N.J.S.A. 10:5-12(d).

133.    As a proximate result of the aforementioned acts and omissions set forth herein, Plaintiff has sustained emotional and pecuniary damages.

**WHEREFORE**, Plaintiff demands judgment in his favor and against Defendants on this Count, together with compensatory and equitable relief, all remedies available under the LAD, punitive damages, pre- and post-judgment interest, attorney's fees and costs of suit, and for such other relief that the Court deems equitable and just. More specifically, Plaintiff demands judgment against Defendants for harm suffered in violation of the NJLAD as follows:

A.    Reinstatement of employment and all benefits;
B.    Back pay and benefits;
C.    Front pay and benefits;
D.    Compensatory damages;
E.    Consequential damages;
F.    Reinstatement;
G.    Punitive damages;
H.    Prejudgment interest and enhancements to off-set negative tax consequences;
I.    Any and all attorneys' fees, expenses and/or costs, including, but not limited to, court costs, expert fees and all attorneys' fees incurred by Plaintiff in the

prosecution of this suit (including enhancements thereof required to off-set negative tax consequences and/or enhancements otherwise permitted under law);

J. Such other relief as may be available pursuant to the LAD and which the Court deems just and equitable;

K. Ordering Defendants to take appropriate corrective action to stop and prevent retaliation at the workplace;

L. Ordering Defendants to take appropriate corrective action to stop and prevent harassment at the workplace;

M. Ordering Defendants to undergo anti-discrimination training;

N. Ordering Defendants to undergo anti-retaliation training;

O. Ordering Defendants to undergo anti-harassment training;

P. Ordering Defendants to undergo workplace civility training;

Q. Ordering Defendants to undergo bystander intervention training;

R. Ordering Defendants to engage a research organization to assess the effectiveness of their anti-discrimination training;

S. Ordering Defendants to engage a research organization to assess the effectiveness of their anti-retaliation training;

T. Ordering Defendants to engage a research organization to assess the effectiveness of their anti-harassment training;

U. Ordering Defendants to engage a research organization to assess the effectiveness of their workplace civility training;

V. Ordering Defendants to engage a research organization to assess the effectiveness of their bystander intervention training;

W. Ordering Defendants to identify an appropriate professional to investigate any future complaints of discrimination;

X. Ordering Defendants to identify an appropriate professional to investigate any future complaints of harassment;

Y. Ordering Defendants to identify an appropriate professional to investigate any future complaints of retaliation; and

Z. Such other relief as may be available and which the Court deems just and equitable.

## COUNT TWO – NJLAD AIDING AND ABETTING LIABILITY

## AS TO INDIVIDUAL DEFENDANTS THOMAS, LOVATO, AND MANLEY

134. Plaintiff repeats each and every allegation set forth above as if set forth more fully at length.

135.    Based on Plaintiff's attempt to increase diversity and inclusion at Defendant TMF, Defendant Thomas, Lovato, and Manley made up this retaliatory scheme full of false allegations to terminate Plaintiff.

136.    Individual Defendants treatment of Plaintiff violates the NJLAD which expressly prohibits any unlawful employment discrimination against any person because of any protected class characteristic, including, but not limited to race, creed, color, national origin, ancestry, age, marital status, civil union status, domestic partnership status, affectional or sexual orientation, genetic information, pregnancy, sex, gender identity or expression, disability or atypical hereditary cellular blood trait of any individual, etc.

137.    Individual Defendants aided, abetted, incited, compelled and/or coerced, and/or attempted to aid, abet, incite, compel and/or coerce Defendant TMF to commit acts and omissions that were in violation of the NJLAD by committing affirmatively harassing, discriminatory, and retaliatory acts toward Plaintiff in violation of the supervisory duty to halt or prevent harassment, retaliation, and discrimination, rendering each of them individually and collectively liable to Plaintiff pursuant to N.J.S.A. 10:5-12(e).

138.    As a proximate result of the aforementioned acts and omissions set forth herein, including disability discrimination, hostile workplace interactions, and pretextual attempts of explaining the discriminatory acts, Plaintiff has sustained emotional and pecuniary damage

**WHEREFORE**, Plaintiff demands judgment in his favor and against Individual Defendants on this Count, together with compensatory and equitable relief, all remedies available under the LAD, punitive damages, pre- and post-judgment interest, attorney's fees and costs of suit, and for such other relief that the Court deems equitable and just. More specifically, Plaintiff demands judgment against Defendants for harm suffered in violation of the NJLAD as follows:

A.      Reinstatement of employment and all benefits;

B.      Back pay and benefits;

C.      Front pay and benefits;

D.      Compensatory damages;

E.      Consequential damages;

F.      Reinstatement;

G.      Punitive damages;

H.      Prejudgment interest and enhancements to off-set negative tax consequences;

I.      Any and all attorneys' fees, expenses and/or costs, including, but not limited to, court costs, expert fees and all attorneys' fees incurred by Plaintiff in the prosecution of this suit (including enhancements thereof required to off-set negative tax consequences and/or enhancements otherwise permitted under law);

J.      Such other relief as may be available pursuant to the LAD and which the Court deems just and equitable;

K.      Ordering Defendants to take appropriate corrective action to stop and prevent retaliation at the workplace;

L.      Ordering Defendants to take appropriate corrective action to stop and prevent harassment at the workplace;

M.      Ordering Defendants to undergo anti-discrimination training;

N.      Ordering Defendants to undergo anti-retaliation training;

O.      Ordering Defendants to undergo anti-harassment training;

P.      Ordering Defendants to undergo workplace civility training;

Q.      Ordering Defendants to undergo bystander intervention training;

R.      Ordering Defendants to engage a research organization to assess the effectiveness of their anti-discrimination training;

S.      Ordering Defendants to engage a research organization to assess the effectiveness of their anti-retaliation training;

T.      Ordering Defendants to engage a research organization to assess the effectiveness of their anti-harassment training;

U.      Ordering Defendants to engage a research organization to assess the effectiveness of their workplace civility training;

V.      Ordering Defendants to engage a research organization to assess the effectiveness of their bystander intervention training;

W.      Ordering Defendants to identify an appropriate professional to investigate any future complaints of discrimination;

X.      Ordering Defendants to identify an appropriate professional to investigate any future complaints of harassment;

Y.      Ordering Defendants to identify an appropriate professional to investigate any future complaints of retaliation; and

Z.      Such other relief as may be available and which the Court deems just and equitable

## DEMAND FOR DISCOVERY OF INSURANCE COVERAGE

Pursuant to *Rule* 4:10-2(b), demand is made that Defendants disclose to Plaintiff's attorney whether or not there are any insurance agreements or policies under which any person or firm carrying on an insurance business may be liable to satisfy part or all of the judgment which may be entered in this action or indemnify or reimburse for payments made to satisfy the judgment and provide Plaintiff's attorney with true copies of those insurance agreements or policies, including, but not limited to, any and all declaration sheets. This demand shall include and cover not only primary insurance coverage, but also any excess, catastrophe, and umbrella policies.

## DEMAND FOR TRIAL BY JURY

Plaintiff demands a trial by jury on all issues.

McOmber McOmber & Luber, P.C.
*Attorneys for Plaintiff, Jesse C. (Jay) Crosson, Ph.D.*

Dated: November 10, 2020          ***/s/ MATTHEW A. LUBER, ESQ.***

## DESIGNATION OF TRIAL COUNSEL

Pursuant to *Rule* 4:25-4, MATTHEW A. LUBER, ESQUIRE, is hereby designated as trial counsel for Plaintiff.

## CERTIFICATION

Pursuant to *Rule* 4:5-1, it is hereby certified that, to the best of my knowledge, there are no other civil actions or arbitration proceedings involving this matter with respect to this matter and no other parties need to be joined at this time.

I certify that the foregoing statements made by me are true. I am aware that if any of the foregoing statements made by me are willfully false, I am subject to punishment.

McOmber McOmber & Luber, P.C.
*Attorneys for Plaintiff, Jesse C. (Jay) Crosson, Ph.D.*

Dated: November 10, 2020            ***/s/ MATTHEW A. LUBER, ESQ.***

# Civil Case Information Statement

**Case Details: MIDDLESEX | Civil Part Docket# L-007812-20**

**Case Caption:** CROSSON JESSE  VS TMF HEALTH QUALITY I NSTITUTE

**Case Initiation Date:** 11/10/2020

**Attorney Name:** MATTHEW ALLEN LUBER

**Firm Name:** MCOMBER MCOMBER & LUBER, PC

**Address:** 54 SHREWSBURY AVE

RED BANK NJ 07701

**Phone:** 7328426500

**Name of Party:** PLAINTIFF : CROSSON, JESSE, C

**Name of Defendant's Primary Insurance Company**

(if known): Unknown

**Case Type:** LAW AGAINST DISCRIMINATION (LAD) CASES

**Document Type:** Complaint with Jury Demand

**Jury Demand:** YES - 6 JURORS

**Is this a professional malpractice case?** NO

**Related cases pending:** NO

**If yes, list docket numbers:**

**Do you anticipate adding any parties (arising out of same transaction or occurrence)?** NO

**Are sexual abuse claims alleged by: JESSE C CROSSON?** NO

**THE INFORMATION PROVIDED ON THIS FORM CANNOT BE INTRODUCED INTO EVIDENCE**

CASE CHARACTERISTICS FOR PURPOSES OF DETERMINING IF CASE IS APPROPRIATE FOR MEDIATION

**Do parties have a current, past, or recurrent relationship?** YES

**If yes, is that relationship:** Employer/Employee

**Does the statute governing this case provide for payment of fees by the losing party?** YES

**Use this space to alert the court to any special case characteristics that may warrant individual management or accelerated disposition:**

**Do you or your client need any disability accommodations?** NO

**If yes, please identify the requested accommodation:**

**Will an interpreter be needed?** NO

**If yes, for what language:**

**Please check off each applicable category: Putative Class Action?** NO  **Title 59?** NO  **Consumer Fraud?** NO

I certify that confidential personal identifiers have been redacted from documents now submitted to the court, and will be redacted from all documents submitted in the future in accordance with *Rule* 1:38-7(b)

11/10/2020
Dated

/s/ MATTHEW ALLEN LUBER
Signed